# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD ROSCOE HILL,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>W.R. WILLIAMS, et al.,<br><br>　　　　　　Defendants.<br>_____/ | CASE NO. 1:03-CV-6661-LJO DLB-P<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. 42) |

I.　Procedural History

　　　　Plaintiff Richard Roscoe Hill ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on Plaintiff's amended complaint filed September 5, 2006, against defendants Williams, Webster, Allen, Villa, Lewis, King, Yates and Rianda ("Defendants") for violation of the First Amendment for denying Plaintiff's subscription issues of Vibe Magazine.

　　　　On August 5, 2008, Defendants filed a motion for summary judgment. On October 14, 2008, Plaintiff filed an opposition and cross motion for summary judgment. Defendants filed a reply and opposition to Plaintiff's cross motion on November 6, 2008.

II.　Legal Standard

　　　　Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©). Under summary judgment practice, the moving party

　　　　　　[A]lways bears the initial responsibility of informing the district court of the

1

>basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56©), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the

proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56©). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).   Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

III.   Undisputed Facts

1.   On August 11, 1995, Plaintiff was convicted of first degree murder and subsequently admitted into CDCR custody.

2.   He transferred to Pleasant Valley State Prison (PVSP) on April 11, 2000.

3.   Plaintiff remained at PVSP until he filed this lawsuit on November 24, 2003.

4.   From April 11, 2000, to the time he filed this lawsuit, November 24, 2003, Plaintiff had a subscription to Vibe Magazine.

5.   Plaintiff also began subscriptions to ESPN Magazine and Ebony Magazine, while at PVSP some time in 2002 or 2003.

6.   For more than a three and a half year period, between April 11, 2000 and November 24, 2003, Plaintiff was denied at least 10 issues of Vibe Magazine.

7.   All of them were denied because the issues contained pictures of gangs or gang related hand gestures.

8.   One of the magazines also contained an image depicting frontal nudity.

9. In each case where Plaintiff was denied a magazine, he was given notice of why the magazine would not be allowed, citing page references.

10. Every time a magazine was denied, Plaintiff filed an inmate grievance challenging the denial.

11. Plaintiff was denied a total of 10 magazines between September of 2001 and November 24, 2003.

12. The October 2001 issue of Vibe Magazine was personally reviewed by mail room Sergeant Webster and he determined that pages 61, 68, 106 and 108 contained numerous gang gestures and photos that depicted gangs (or gang related hand gestures), drugs or unlawful activities.

13. The November 2001 issue of Vibe Magazine was personally reviewed by mail room Sergeant Webster and he determined that pages 15, 19, 57 and 62 contained numerous gang gestures and photos that depicted gangs (or gang related hand gestures), drugs or unlawful activities.

14. The February 2002 issue of Vibe Magazine was personally reviewed by mail room Sergeant Webster and he determined that pages 52, 54 and 118 contained numerous photos that depicted gangs (or gang related hand gestures), drugs or unlawful activities.

15. The June 2002 issue of Vibe Magazine was personally reviewed by mail room Sergeant Webster and he determined that pages 89, 100, 111, 115 and stickers attached to that magazine contained numerous gang gestures and photos that depicted gangs (or gang related hand gestures), drugs or unlawful activities.

16. The September 2002 issue of Vibe Magazine was personally reviewed by mail room Sergeant Webster and he determined that pages 160, 211 and 242 contained photos that depicted gangs (or gang related hand gestures), drugs or unlawful activities.

17. The July 2003 issue of Vibe Magazine was personally reviewed by mail room Sergeant King and he determined that page 152 contained a photograph of an individual making a gang related hand gesture and using his right hand.

18. The August 2003 issue of Vibe Magazine was personally reviewed by mail room Sergeant King and he determined that pages 55, 66 and 70 contained photos that depicted gangs (or gang related hand gestures), and/or a drawing of a woman displaying her breasts and genitals.), drugs or unlawful activities.

19. The October 2003 issue of Vibe Magazine was personally reviewed by mail room Sergeant Corley

and he determined that pages 74, 84, 86 and 94 contained photographs of gang related hand gestures.

20. The November 2003 issue of Vibe Magazine was personally reviewed by mail room Sergeant Webster and he determined that pages 58, 109, 117, and 154 contained photographs of gang related hand gestures.

21. The December 2003 issue of Vibe Magazine was personally reviewed by mail room Sergeant Webster and he determined that pages 128 and 218 contained images of gang or gang hand gestures.

22. At the time of denial of the magazines (and continuing today), PVSP's policy required that all magazines coming into PVSP be reviewed by mail room staff to ensure that prohibited material did not enter the prison.

23. If a magazine included any prohibited content, the entire magazine was disallowed.

24. Inmates were not permitted to possess altered magazines at all.

25. Defendants contend removing only the offending pages would be impracticable since it would require a much greater number of personnel hours to correctly identify the offending pages and tear them out, sometimes for as many as 200 magazines for one issue.

26. There is also the possibility of correctional staff making a mistake and tearing out the wrong pages, thereby allowing the prohibited material into the institution.

27. Having an inmate receive a magazine with torn pages also meant dealing with inmate grievances for the destruction of property, with inmates alleging that correctional staff destroyed their property and asking to be reimbursed for the cost of the magazine.

28. Altered magazines were not allowed into the prison and the offending pages could not just be excised from the magazine.

29. Operational Procedure (OP) 59 established the rules relating to the receiving of inmate mail.

30. OP 59, section RR provided a list of unapproved inmate mail items.

31. Under OP 59 (RR), subsection 12, inmates were not allowed to receive photos depicting gangs (or gang related hand gestures), drugs, or unlawful activities.

32. Under OP 59(RR) subsection 13, inmates were not allowed to receive magazines that were altered

in any way, meaning a magazine that has pages or covers removed.

33. Under OP59(RR) subsection 16, inmates were not allowed to receive any altered items.

34. Under OP 59(RR) subsection 17, inmates were not allowed to receive any items used to promote or identify gang membership.

35. Materials depicting gangs, gang related hand gestures, drugs or unlawful activities, were deemed to be a threat to the safety and security of the institution.

36. Specifically, California Code of Regulations title 15, section 3023(b), stated that gangs were a serious threat to the safety and security of California prisons. Section 3023(a) stated that inmates "shall not knowingly promote, further or assist any gangs as defined in section 3000." Based on these two Title 15 sections, inmates were prohibited from receiving, in magazines or otherwise, photos depicting gangs (or gang related hand gestures), drugs, or unlawful activities.

37. Mail room staff, and in particular, Mail Room Sergeants, were trained in how to identify imagery of gangs, gang related hand gestures, drug activities, and unlawful activities.

38. If at any time mail room staff was unsure about the identity of imagery containing any of the above, they would consult with PVSP's gang specialist unit in PVSP's Investigative Services Unit (ISU), to further identify any possible prohibited material.

39. Every monthly issue of each magazine that came into PVSP was inspected by mail room staff to ensure that the magazine did not violate any standards set forth by CDCR.

40. After mail room staff made their judgment according to the rules and regulations that govern mail and mail content, the Correctional Captain inspected the magazine to ensure that the content was appropriate and that all policies and procedures had been followed.

41. If mail room staff decided that a magazine contained inappropriate content, each inmate would be given a notification of Disapproval- Publication, or a CDC 1819 form, composed by a Mail Room Sergeant and approved by a Correctional Captain.

42. That notice would inform the inmate of how or why the magazine was prohibited and provide him the opportunity to mail the publication to someone outside the prison.

43. Hill received every issue of Vibe Magazine issued from the first time he arrived at PVSP, in April 2000 until the October 2001 issue.

44. He was able to subscribe to other magazines including Ebony and ESPN.
45. None of Hill's Ebony magazines were ever denied.
46. Hill did not receive one issue of ESPN while at HDSP but it is unclear why.
47. Providing an inmate with an altered magazine was prohibited both for reasons of safety and cost efficiency.
48. Allowing altered magazines would make it easier to conceal contraband and thus, more difficult to search for contraband.
49. If altered magazines were allowed, that would require the constant search of each magazine for contraband.
50. There is also the possibility of correctional staff making a mistake and tearing out the wrong pages, thereby allowing the prohibited material into the institution.
51. Removing pages would also require a much greater number of personnel hours to correctly identify the offending pages, and tear them out, sometimes as many as 200 magazines for one issue.
52. Furthermore, allowing magazines to enter the institution with torn pages also means dealing with inmate grievances for the destruction of property with inmates alleging that correctional staff destroyed their property and asking to be reimbursed for the cost of the magazine.
53. Mail Room Sergeants Webster, King, and Corley each personally reviewed the magazines denied to Hill.
54. Mail Room Sergeants Webster, King and Corley each received training in how to identify imagery of gangs, gang related hand gestures, drug activities, and unlawful activities.
55. At any time, if Mail Room Sergeants Webster, King or Corely were unsure about the identify of gang imagery they would consult with the gang specialist unit in PVSP's Investigative Services Unit.
56. Mail Room Sergeants Webster, King and Corley in reviewing the Vibe Magazines denied to Hill, found that the magazines prohibited from entering the institution, contained some sort of gang symbolism.
57. Hill brought this action on November 24, 2003.
58. With respect to the denial of his November 2003 issue of Vibe Magazine, Hill did not receive a Second Level response to his appeal until December 12, 2003 by defendant Yates.

59. With respect to the denial of his November 2003 issue of Vibe Magazine, Hill did not receive a Third and final level response until March 2004.

60. With respect to the denial of his December 2003 issue of Vibe Magazine, Hill did not receive a First Level Response by Defendant Corley until December 9, 2003.

61. With respect to the denial of his December 2003 issue of Vibe Magazine, Hill did not receive a Second Level response by Defendant Yates until January 27, 2004.

IV.  Discussion

Both parties assert that they are entitled to judgment as a matter of law. The claim in this action arises from the denial of Plaintiff's subscription issues of Vibe Magazine. Plaintiff alleges that the denial of his magazine on several occasions violated his First Amendment Rights.

A.  Exhaustion of Administrative Remedies

Defendants argue that Plaintiff did not exhaust his available administrative remedies with respect to the denial of the November and December 2003 issues of Vibe Magazine and therefore Plaintiff has no claim associated with these issues. Defendants submit evidence that with respect to the denial his November 2003 issue of Vibe Magazine, Plaintiff did not receive a Second Level response to his inmate appeal until December 21, 2003 and he did not receive a Third and Final Level response until March 2004, almost six months after filing this action on November 24, 2003. DUF 58-59. With respect to the December 2003 issues, Defendants present evidence that Plaintiff did not receive a First Level response until December 9, 2003 and he did not receive a Second Level response until January 27, 2004. DUF 60-61.

Pursuant to the Prison Litigation Reform Act of 1995, "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Prisoners are required to exhaust the available administrative remedies prior to filing suit. Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910, 918-19 (2007); McKinney v. Carey, 311 F.3d 1198, 1199-1201 (9th Cir. 2002). Exhaustion is required regardless of the relief sought by the prisoner and regardless of the relief offered by the process, Booth v. Churner, 532 U.S. 731, 741, 121 S.Ct. 1819 (2001), and the exhaustion requirement applies to all prisoner suits relating to prison life, Porter v. Nussle,

435 U.S. 516, 532, 122 S.Ct. 983 (2002).

The California Department of Corrections and Rehabilitation has an administrative grievance system for prisoner complaints. Cal. Code Regs., tit. 15 § 3084.1 (2008). The process is initiated by submitting a CDCR Form 602. Id. at § 3084.2(a). Four levels of appeal are involved, including the informal level, first formal level, second formal level, and third formal level, also known as the "Director's Level." Id. at § 3084.5. In order to satisfy section 1997e(a), California state prisoners are required to use this process to exhaust their claims prior to filing suit. Woodford v. Ngo, 548 U.S. 81, 85-86, 126 S.Ct. 2378 (2006); McKinney, 311 F.3d at 1199-1201.

Section 1997e(a) does not impose a pleading requirement, but rather, is an affirmative defense under which defendants have the burden of raising and proving the absence of exhaustion. Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910, 921 (2007); Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003). The failure to exhaust nonjudicial administrative remedies that are not jurisdictional is subject to an unenumerated Rule 12(b) motion, rather than a summary judgment motion. Wyatt, 315 F.3d at 1119 (citing Ritza v. Int'l Longshoremen's & Warehousemen's Union, 837 F.2d 365, 368 (9th Cir. 1988) (per curiam)).

Defendants filed an answer on September 10, 2007 and the Court issued a scheduling order on October 9, 2007. Pursuant to that scheduling order, the deadline for filing unenumerated Rule 12(b) motions was December 5, 2007. Defendants did not file the present motion until August 5, 2008. Accordingly, Defendants' motion related to Plaintiff's failure to exhaust his available administrative remedies is untimely and should be denied on that basis.

B. Denial of Vibe Magazine

Plaintiff alleges that in September 2001 and thereafter, defendants Williams, King, Rianda and Yates denied him his publication Vibe Magazine, asserting that it included "gang hand gestures" Comp., p.3. He alleges that defendant Webster, Allen, Villa and Lewis supported the decision without an investigation. *Id*. Plaintiff contends defendants failed to consider the publication as a whole to determine whether it had "social, political, artistic or scientific value." *Id*.

Prisoners clearly have "a First Amendment right to send and receive mail." Witherow v. Paff, 52 F.3d 264, 265 (9th Cir. 1995). However, not every infringement on this right rises to the level of a

9

constitutional violation. The question is whether the policy at issue in this action *impermissibly* infringed upon plaintiff's right to receive publications, resulting in a violation of plaintiff's First Amendment rights.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turner v. Safley, 482 U.S. 78, 84 (1987). "Thus, [a] prisoner retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Ashker v. California Dep't Of Corr., 350 F.3d 917, 922 (9th Cir. 2003) (internal citations and quotations omitted). "A prison regulation that impinges on inmates' constitutional rights therefore is valid only if it is 'reasonably related to legitimate penological interests.'" Ashker, 350 F.3d at 922 (quoting Turner, 482 U.S. at 88). "A regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Turner, 482 U.S. at 89.

However, "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Turner, 482 U.S. at 84 (internal quotations and citations omitted). Thus, "'deference is accorded to prison authorities in order to avoid hampering their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration,'" Ashker, 350 F.3d at 922 (quoting Turner, 482 U.S. at 85, 88), and the regulation must be upheld if it is reasonably related to legitimate penological interests. Mauro v. Arpaio, 188 F.3d 1054, 1058 (9th Cir. 1999) (citing to Turner, 482 U.S. at 84-85 (internal quotations omitted)). In determining the reasonableness of the regulation, the court must consider the following factors: (1) whether there is a "valid, rational connection between the regulation and the legitimate government interest put forward to justify it," (2) "whether there are alternative means of exercising the right," (3) the impact that the "accommodation of the asserted constitutional right will have on guards and other inmates," and (4) "the absence of ready alternatives." Turner, 482 U.S. at 89-90.

1. Rational Connection to Legitimate Penological Purpose

In considering the first Turner factor, the court must "(1) determine whether the regulation is legitimate and neutral, and (2) assess whether there is a rational relationship between the governmental objective and the regulation." Ashker, 350 F.3d at 922.

In determining whether there is a rational relationship between the purported objective and

>the regulation, the level of scrutiny applied to the judgment of prison officials depends on the circumstances in each case. If an inmate presents sufficient evidence to refute a common-sense connection between a legitimate objective and a prison regulation, ... the state must present enough counter-evidence to show that the connection is not so remote as to render the policy arbitrary or irrational." If, however, the inmate does not present evidence sufficient to refute a common-sense connection between the regulation and the government objective, prison officials need not prove that the banned material actually caused problems in the past or that the materials are likely to cause problems in the future. The only question is whether prison administrators reasonably could have thought the regulation would advance legitimate penological interests.

Ashker at 922-23 (internal quotations and citations omitted).

Defendants contend Plaintiff was denied issues of Vibe Magazine because the magazines contained pictures of gangs or individuals making gang hand signs, drugs or unlawful activities. Defendants contend possession of such materials is a threat to institutional safety. Defendants submit that Operational Procedure ("OP") 59 established the rules relating the receiving of inmate mail. DUF 29. OP59, section RR provided a list of unapproved inmate mail items. DUF 30. Pursuant to OP 59 (RR) subsection 12, inmates were not allowed to receive photos depicting gangs (or gang related hand gestures), drugs or unlawful activities. DUF 30. Pursuant to OP(RR) subsection 17, inmates were not allowed to receive any items used to promote or identify gang membership. DUF 34. Materials depicting gangs, gang related hand gestures, drugs or unlawful activities, were deemed to be threat to the safety and security of the institution. DUF 35. California Code of Regulations, title 15, section 3023(b) states that gangs were a serious threat to the safety and security of California prisons. DUF 36. Section 3023(a) states that inmates "shall not knowingly promote, further or assist any gangs as defined in section 3000." *Id.* Based on these two regulations, inmates were prohibited from receiving, in magazines or otherwise, photos depicting gangs (or gang related hand gestures), drugs or unlawful activities. *Id.*

Defendants contend that under the above policies, mail room staff were required to review all magazines in order to prevent magazines containing pictures of gangs, or gang related hand gestures from entering the institution. *See* DUF 39-40.

Defendants argue that gang suppression, as a means to ensure the safety and security of correctional staff, personnel, inmates and the public, is a legitimate penological interest (*See Wilkinson v. Austin*, 545 U.S. 209, 227 (2005)) in that gangs present a serious threat to the safety and security of California prisons. *See* Cal.CodeRegs.tit. 15 § 3023. Defendants further argue that safety is "central to

11

all other corrections goals." *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1988) (citing *Pell v. Pecunier*, 417 U.S. 817, 823 (1974).

Defendants argue the regulations at issue prevent any gang symbolism from entering the prison through photographs and is not aimed specifically at Plaintiff. Defendants argue the justification for the policy is two-fold. First, the material, in the prison context, "reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct. *See Thornburgh* 490 U.S. at 412-413. Thus, Defendants argue that even if Plaintiff did not use the pictures for any reason, if the magazine was inside the prison, it could be expected to circulate and others could use it to proclaim identity with a particular gang. Second, Plaintiff's or other inmates' mere possession of such material may create "inferences about [his] . . . gang affiliation from that material and cause disorder." *Id*. at 412.

Defendants also point out that the policy behind denial of the Vibe Magazines at issue (ie, the magazines contained gang imagery and gangs are a threat to the safety of California prisons) is neutral as the Supreme Court meant and used that term in *Turner Id*. at 415-416, in that the regulations require that each magazine be reviewed rather than a categorical denial of certain magazines. Defendants contend that magazines at issue were denied because they contained pictures of gang imagery and gangs were deemed a threat to the safety of California prisons. Cal.Code Regs. Tit. 15 § 3023.

Defendant has set forth sufficient evidence to establish the common-sense connection between the policy at PVSP which led to the confiscation and the government objective. Plaintiff does not dispute the connection between the policy itself and the government objective but argues that Defendants were required to follow the law under *Miller v. California*, 413 U.S. 15 (1973) and California Code of Regulations Title 15, section 3006 to determine "whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the purient interest."

Plaintiff's reliance on *Miller v. California* is misplaced. The test enunciated in *Miller* to determine whether a work is obscene and therefore unprotected by the First Amendment does not apply in the prison context, where prisoners only "retain those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." <u>Ashker v. California Dep't Of Corr.</u>, 350 F.3d 917, 922 (9th Cir. 2003) (internal citations and quotations omitted). The Supreme Court has held that the *Turner v. Safely* test must be used to determine whether the regulations

at issue are reasonably related to legitimate penological interests.

Plaintiff cites California Code of Regulations Title 15, section 3006(A)(15)[1] to argue that Defendants should have reviewed the magazine as a whole instead of considering the magazine contraband based on four pages or less of each magazine. Plaintiff's argument is not persuasive because the magazines at issues were not denied pursuant to section 3006(c)(15). Section 3006(c)(15) defines obscene material, in relevant part, as

> material taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest; and is material which taken as a whole, depicts or describes sexual conduct; and which, taken as a whole, lacks serious literary, artistic, political, or scientific value.

However, Plaintiff's magazines were denied because they contained frontal nudity in violation of section 3006(c)(17) (DUF 18) or because the magazine contained material deemed to be a threat to the legitimate penological interest of safety, in violation of section 3006(c)(16). DUF 12-21. Under section 3006, only material that may be considered obscene is analyzed reviewing the material as a whole. See Cal.Code Regs. Tit.15 § 3006(c)(15),(16), (17). Plaintiff's argument that the magazines should have been reviewed as a whole is not supported by the regulations or any other relevant legal authority.

Thus, Plaintiff has failed to refute the common-sense connection between the regulation and the stated objective. Given that plaintiff did not refute the common-sense connection, defendant is not required to submit evidence demonstrating "that the connection is not so remote as to render the policy arbitrary or irrational." Ashker v. California Department of Corrections, 350 F.3d 917, 922 (9th Cir. 2003) (quotations and citation omitted).

2. Alternative Means of Exercising Right

The second factor requires consideration of "whether there are alternative means of exercising the right that remain open to prison inmates." Turner, 482 U.S. at 90. "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of

---

[1] The Court assumes Plaintiff refers to section 3006(c)(15) since that is the only subsection (15) under that code section.

judicial deference owed to correctional officials . . . in gauging the validity of the regulation." Id. (internal quotations and citations omitted).

Defendants contend that Plaintiff had alternatives to exercising his First Amendment rights relating to Vibe Magazine in that he was able to subscribe to other magazines including Ebony and ESPN which did not contain gang symbols. *See* DUF 29.

Plaintiff contends that Ebony and ESPN are not alternatives to Vibe Magazine in that they do not "relate to a theme of Vibe." Opposition to Motion for Summary Judgment, p.2:10-12. However, Plaintiff does not explain why the magazines differ. While defendant has submitted some evidence that there are alternate means to the exercise of the right in question, plaintiff has not submitted any evidence that are no avenues available to receive publications. The regulations do not ban all publications and do not categorically exclude specific magazines. Based on sections 3023(a) and (b), inmates were prohibited from receiving, in magazines or otherwise, photos depicting gang as (or gang related hand gestures), drugs or unlawful activities. Plaintiff was able to and did receive other publications, including other issues of Vibe Magazine. DUF 36. Accordingly, the Court finds that the second factor weighs in favor of Defendants.

### 3. Impact of Accommodating Right

The third factor requires consideration of the impact that the "accommodation of the asserted constitutional right will have on guards and other inmates . . . ." Turner, 482 U.S. at 90. Defendants submit and Plaintiff does not dispute that materials depicting gangs, gang related hand gestures, drugs or unlawful activities, are deemed a threat to the safety and security of the institution. DUF 35. Defendants contend that possession of gang materials can create inferences about gang affiliation or sympathies, creating an undercurrent of disorder which makes the jobs of all who work at the prison more dangerous and more difficult. Defendants assert that gangs and gang warfare in prisons threaten prison security and the saftey of everyone in the prison. *See* Cal.Code Regs. Tit. 15 § 3023. Defendants argue that the potential for violence that possession of such materials can incite and the right to possess such materials "can be exercised only at the cost of significantly less liberty and safety" for both guards and prisoners. *Id*.

Plaintiff argues that the impact described by Defendants is exaggerated and only in "defendants'

minds." Other than his own conclusory statement, Plaintiff provides no evidence to refute the threat caused by possession of gang materials described in regulations and by Defendants. Plaintiff's lay opinion about the impact caused by inmates' possession of gang materials, is not persuasive. Accordingly, the Court finds the third factor also weighs in favor of Defendants.

### 4. Absence of Ready Alternatives

"Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation." Turner, 482 U.S. at 90. Plaintiff bears the burden of demonstrating "that there are obvious, easy alternatives to the regulation." Mauro, 188 F.3d at 1062.

Defendants argue there is no alternative to a complete ban of any magazine that includes pictures containing gangs, gang hand gestures or gang members engaged in illegal activity. Plaintiff contends that the confiscated magazines should be viewed as a whole, cover to cover to determine whether they pose a threat and that the "theme" of the magazine should be considered. As discussed, Plaintiff's suggestion is unpersuasive. Defendant has established that at the time of the denial of Plaintiff's magazines, PVSP's policy required that all magazines coming into PVSP be reviewed by mail room staff to ensure that prohibited material did not enter the prison. DUF 22. Mail room staff, and in particular, mail room sergeants were trained in how to identify imagery of gangs, gang related hand gestures, drug activities and unlawful activities. DUF 37. Photos depicting gangs, drugs or unlawful activities were prohibited as these materials were deemed to be a threat to the safety and security of the institution. DUF 31, 35. The bare suggestion that a magazine be viewed in its entirety to determine whether it contained prohibited material is not an obvious, easy alternative to the regulation, which specifically targets photos depicting gang material determined by correctional officials to create the precise problems the regulation seeks to alleviate. Plaintiff has not set forth any alternative that can fully accommodate his rights at a de minimis cost to valid penological interests.

Accordingly, after consideration of all four Turner factors, the court finds that Defendants are entitled to summary judgment on Plaintiff's First Amendment claim against him and Plaintiff's motion for summary judgment must be denied.

### C. Application of PVSP Policy to Plaintiff's Materials

To the extent Plaintiff challenges whether the confiscated materials fell within the purview of the

15

1 regulations, the Court will address Plaintiff's alternate theory.

2 California Code of Regulations title 15, section 3000 states that gangs are a serious threat to the safety and security of the institution. Section 3023(a) states that "inmates shall not knowingly promote, further or assist any gangs as defined in section 3000. Based on these two Title 15 sections, inmates at PVSP were prohibited from receiving, in magazines or otherwise, photos depicting gangs (or gang related hand gestures), drugs or unlawful activities. Decl. Webster¶ 9. Pursuant to Operational Procedure 59(RR) subsection 17, inmates were not allowed to receive any items used to promote or identify gang membership. *Id.*

Plaintiff argues that the Constitution; *Miller v. California* and "California Code of Regulations Title 15 3006(A)(15) require a determination whether: (a) the average person, applying contemporary community standards would find the work taken as a whole, appeals to the purient interest; (b) whether the work depicts or describes in a patently offensive way; and ©) whether the work taken as a whole lacks artistic, literary, political, or scientific value. Plaintiff argues that only a few pages of his material were found to contain the allegedly prohibited material and thus the entire magazine should not have been denied.

Plaintiff's legal arguments are misplaced for the reasons discussed above. In addition, Plaintiff does not deny that his publications contained the images described. He also does not dispute that Mail Room Sergeants Webster, King and Corley each personally reviewed the magazines denied to Plaintiff. DUF 53. With regard to the November 2001 issues, Plaintiff disagrees with Defendant Webster's interpretation of the pictures as depicting "gang hand gestures." Declaration in Support of Disputed Factual Issues, ¶¶ 4-7. However, Plaintiff has not alleged that he is familiar with gang symbolism, nor that he is qualified to provide an opinion concerning gang symbolism. In contrast, mail room staff and in particular Mail Room Sergeants, received training in how to identify imagery of gangs, gang related hand gestures, drug activities and unlawful activities. DUF 37. If at any time mail room staff was unsure about the identity of imagery containing any of the above, they would consult with PVSP's gang specialist unit in PVSP's Investigative Services Unit, to further identify any possible prohibited material. DUF 38. Courts must accord wide-ranging deference to prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and

discipline and to maintain institutional security." *Toussaint v. McCarthy*, 801 F.2d 1080, 1104 (9th Cir. 1986 citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Under these circumstances and absent any evidence from Plaintiff other than his own lay opinion, the Court must defer to decisions of prison officials.

The court is equally unmoved by plaintiff's assertions that because only select pages of his publications (four pages at most) were found to contain prohibited material, the publication as a whole should not have been prohibited. Defendants present evidence that the policy at PVSP was that if a magazine was prohibited because of forbidden content, the entire magazine was not allowed to enter the institution. DUF 23. Mail room staff was not permitted to tear out pages from a magazine addressed to an inmate for both safety reasons and costs efficiency. Decl. Webster ¶ 14. Plaintiff provides no evidence to refute the concerns articulated by defendant Webster regarding altered magazines. Indeed, Plaintiff concedes that he never requested removal of the offending pages.

V.   Conclusion

The court finds that Defendants are entitled to judgment as a matter of law on Plaintiff's First Amendment claim against them. Because of this finding, it is unnecessary to reach defendants' argument that he is entitled to qualified immunity. Accordingly, based on the foregoing, it is HEREBY RECOMMENDED that defendants' motion for summary judgment, filed August 5, 2008 be GRANTED and Plaintiff's cross motion for summary judgment filed October 14, 2008 be DENIED, thus concluding this action in its entirety.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **December 11, 2008**          /s/ **Dennis L. Beck**
                                        UNITED STATES MAGISTRATE JUDGE